[No. 36612. Department Two. January 23, 1964.]

THE STATE OF WASHINGTON, *Respondent*, v. ARTHUR DALE
JACK *et al.*, *Appellants.*[*]

*Walter R. Rodgers, III, Philip S. Brooke, Jr.,* and *Joseph
J. Stangle,* for appellants.

*Willard A. Zellmer* and *Roger H. Underwood,* for respondent.

FINLEY, J.—The appellants herein were charged and
convicted of grand larceny in the Superior Court of Lincoln
County. The case involves an alleged theft of two semi-
trailer truckloads of wheat from the Wheatridge Grain
Elevator, located in a sparsely populated area and at an
isolated spot on State Highway 4-B, approximately 13
miles south of Wilbur, Washington.

The assignments of error in this appeal raise the fol-
lowing questions:

[*]Reported in 388 P. (2d) 566.

(1) Whether there was probable cause justifying the arrest of appellants Williams, Lunceford and Jack;

(2) Whether there was probable cause justifying the arrest of appellant Erickson;

(3) Whether the state's evidence was sufficient (a) to resist defense motions to dismiss, for a directed verdict, and for arrest of judgment and for a new trial, and (b) to support a verdict of guilty by the jury as to each appellant;

(4) Whether the trial court erred in limiting the time of all three defense counsel to a total of 1 hour, or 20 minutes each, respecting argument to the jury in behalf of their respective clients.

The facts which reasonably can be adduced from the record are as follows: Employees of the Wheatridge Grain Elevator, upon checking and measuring the amount of grain on hand, determined that substantial amounts were missing during a period including the last several days of July to August 6, 1961. Theft of the wheat by unknown parties from the isolated and unguarded Wheatridge Elevator was suspected. Charles Smith, a retired police officer of the town of Wilbur, Washington, was employed as a night watchman and guard by the Llewellyns, owners and operators of the Wheatridge Elevator. Smith was on duty August 6 through August 11 at the Wheatridge Elevator from 9 p.m. until about 5 a.m. On the night of August 10, or the morning of the 11th, Smith concealed himself in a nearby field of stubble and kept watch on the grain elevator. At about 1:30 a.m., he saw a long car stop alongside the elevator. Only its parking lights were turned on. Two men got out. They carefully inspected the elevator premises. While one man entered the building, the other remained outside and turned a flashlight on the grain-loading spouts of the elevator. From the beam of the flashlight the man's face was briefly revealed, thus enabling Officer Smith later to recognize and identify the man as appellant Arthur Dale Jack. The night was too dark for Officer Smith to identify the long car by color, model, or make. He observed the two men re-enter the car and drive away in the direction of Wilbur without turning on the headlights until they

were some distance from the elevator. Around 2:45 or 3 a.m., an automobile (thought by Smith to be the same one), again with only its parking lights on, appeared and parked alongside the Wheatridge Elevator. It was followed immediately by a semitrailer truck with a wheat rack. The truck drove under the middle spout on the east side of the elevator, and Officer Smith then heard grain running into the truck. Although it was too dark for Officer Smith to identify the men, or to identify the truck, he kept watch as closely as possible and saw the truck moved forward at short intervals to distribute the grain evenly in the truck bin. A second semitrailer truck, with no lights on, pulled in behind the first, moved under the elevator spout as the first truck left in the direction of Odessa, Washington on State Highway 4-B. The motors of both trucks were kept running while the loading was taking place. About the time the second truck pulled under the spout, Officer Smith was able to enter the elevator building unobserved and make a telephone call to advise the owners, the Llewellyns, of the situation at the grain elevator. He remained in the building until the second truck and scout car pulled away from the elevator in the direction of Odessa. At the trial Smith stated that he was surprised that the loading of the trucks occurred so quickly—in what to him seemed to be about 15 or 20 minutes. Upon receiving Smith's message, the Llewellyns dressed quickly and drove at a high rate of speed from Wilbur to the site of the Wheatridge Elevator. Smith testified that they arrived shortly after the second truck had left in the direction of Odessa. The scout car had turned back in the direction of Wilbur. It was seen by the Llewellyns as they were en route to the Wheatridge Elevator, and was recognized by them as a red station wagon, occupied by two men.

After reaching the elevator and picking up Officer Smith, the Llewellyns gave immediate chase to the trucks heading south on Highway 4-B toward Odessa. An employee was left at the elevator to notify the sheriff of Lincoln County and inform him of the direction of the chase.

Approximately 8 miles down the highway, the Llewellyns and Smith sighted the lights of what appeared to be a truck ahead of them by several miles. These lights were kept in sight until the vehicle was overtaken some 14 miles south of the Wheatridge Elevator. As the pursuers pulled up behind the vehicle (which proved to be a semitrailer truck equipped with a tarpaulin-covered wheat rack), the elder Llewellyn fired a shotgun at the left rear wheels of the trailer, and then, as the pursuers pulled partially alongside the fleeing truck, he fired at the left rear wheel of the truck itself. Surprisingly and perhaps fortunately for all concerned, the tires were not blown off. Subsequently, one tire deflated. In any event, the truck stopped immediately. Its driver, appellant Williams, and his companion, appellant Lunceford, were ordered from the truck at gunpoint under a threat of being "cut down." They were handcuffed by Officer Smith and told they were under arrest for theft of the load of wheat. Neither Williams nor Lunceford would make any comment or statement concerning the wheat, its ownership or their possession of it.

Williams and Lunceford were ordered to lie, face down, by the side of the road to await the arrival of the sheriff. Shortly thereafter, a red Ford station wagon (which the Llewellyns recognized as the one which they had seen en route from Wilbur to the elevator) drove up and stopped behind the halted truck. The two occupants were ordered from the car, again at gunpoint. Appellant Jack was recognized by Smith as the man whose face he had seen reflected by the flashlight earlier that night at the elevator. Jack and the other occupant, Walker[1], were told that they were under arrest in connection with the wheat theft. They were tied up and ordered to lie down by the side of the road with Williams and Lunceford.

Following the arrests, a bill of lading, ostensibly covering the truckload of wheat, was found in the glove compartment of the truck. Certain portions of the printed form had been changed by rough, somewhat untidy, pen-and-ink inter-

[1]Walker was not tried with codefendants herein. He had skipped bail and his whereabouts were unknown.

lineation. Although this was not in itself necessarily suspicious, it served to make the bill of lading at least somewhat distinct or different from usual bills. In addition, the bill indicated the origin of the wheat as Coeur d'Alene, Idaho; the shipper as North Idaho Grain Company, and the driver as Al Williams. The destination of the wheat was listed on the bill of lading simply as "River Grain Burbank, Washington."

On the assumption that the other truck involved in the theft carried a similar bill of lading in terms of (a) destination, (b) origin of the shipment, (c) the shipper, and (d) the consignee, word was relayed to the sheriff of Walla Walla County and to the River Grain Terminal at Burbank ·
to be on the lookout for a semitrailer wheat truck with such a bill of lading. The Llewellyns proceeded with little delay to the River Grain Terminal in Burbank, Washington.

A bill of lading answering the indicated description had been presented at the River Grain Terminal by appellant Erickson. The deputy sheriff and the Llewellyns were notified. They joined forces in questioning Erickson, driver of the Diamond-T truck and semitrailer load of wheat, which was third in line waiting to dump wheat at the terminal. Erickson denied that the wheat was stolen, but admitted that he had traversed Highway 4-B on the previous night (where he would have had to pass the Wheatridge Elevator). He claimed·that the wheat he carried belonged to one Walker. The elder Llewellyn, noting that Walker had been arrested and aware of the other circumstances noted hereinbefore, stated to the deputy sheriff: "That's good enough for me; I'll sign a complaint." The deputy then placed Erickson under arrest and impounded the truck.

■ The first problem with which we are concerned is whether there was probable cause for the arrests of appellants Williams, Lunceford, Jack and Erickson. The answers to this will resolve the closely related question of whether the trial court erred in admitting certain evidence (including the bill of lading) obtained (a) in the search of the first truck (following its stoppage—frontier-vigilante style—on Highway 4-B south of Wilbur) and (b) in connection with

the arrest of Erickson and the impounding of the second truck by the deputy at the terminal. Admissibility depends on the legality of the search and seizure, and that depends upon the legality of the antecedent arrests. There is no need here for lengthy citation of authorities respecting the law as to when an officer may make an arrest without a warrant; see *State v. Young* (1952), 39 Wn. (2d) 910, 239 P. (2d) 858. In that case we relied upon the following quotation from *State v. Hughlett* (1923), 124 Wash. 366, 214 Pac. 841:

" . . . Proper cause for arrest has often been defined to be a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in believing the accused to be guilty. . . ."

The rule seems to be similar when an arrest is a so-called citizen's arrest, made by one not a law enforcement officer; *i.e.*, it requires reasonable and probable cause to believe the arrested party guilty of a felony before the arrest will support a search and seizure of evidence of a crime. See Annot., *Information, belief, or suspicion as to commission of felony, as justification for arrest by private person without warrant*; 133 A.L.R. 608 (1941).

█ We are convinced that reasonable or probable cause existed for the arrests of the defendants Williams, Lunceford and Jack without warrant. Officer Smith had seen two semitrailer trucks with wheat bins at the elevator; had heard wheat being dumped into the first, and had seen the second truck move under a loading spout of the Wheatridge Elevator. His telephone call brought the Llewellyns to the elevator shortly after the second truck had departed. Chase was immediate, made at 3:30 to 4 in the morning, on a little-traveled road. No other cars or trucks went by the elevator between the time of the theft and the pursuit. Lights of the truck were seen by the pursuers at a point 7 miles from the scene of the wheat thefts, and the truck was apprehended within a distance of 14 miles. In the particular area, some roads cross Highway 4-B, but it is the improved, most direct, route through and out of the area. As we said in *State v. Young, supra,* the

improbability of the presence of vehicles in the area of the general description at that time of the night can be an important factor in providing probable cause for the arrest.

Upon the arrival and stopping of the red station wagon in which the defendant Jack was riding, probable cause for his arrest certainly existed, both because of the station wagon's very probable connection with the truck, deducible from Officer Smith's observations, and the observance of the red station wagon by the Llewellyns as they sped toward the elevator; and lastly, the fact that Jack was recognized by Smith as the man he had seen earlier "casing" the elevator.

We likewise have no doubt that probable cause existed for the later arrest by the deputy sheriff of Erickson, driver of the second truck, at the River Grain Terminal in Burbank, Washington. Suspicion was first directed to Erickson by his presentation of a bill of lading similar to the one carried by the truck previously apprehended. Most importantly, in the questioning by the deputy sheriff prior to the arrest, Erickson stated that the wheat was owned by Walker (already under arrest). He further stated that he had taken a route the previous night which took him past the looted elevator. The connection engendered between Erickson's truck and the truck already captured, together with the happenings at the looted elevator, provided ample probable cause for his arrest.

The same facts, providing as they do the probable cause for the arrest of the appellants, also provide ample evidence to support the jury's verdict of guilty as to each of the defendants. For the same reasons, the trial judge did not err in denying the appellants' trial motions (a) for dismissal, (b) for a directed verdict, and (c) for arrest of judgment and a new trial.

■ The final question is whether the trial court erred in restricting argument to the jury to 20 minutes for each defense counsel, or a total of 1 hour for all defendants on trial. The time to be allowed for jury argument is a matter largely within the discretion of the trial court. The instant case is not particularly complicated, either from the

standpoint of the state or the defense. The charges were the same, and the case of the state is the same against all. With these factors in mind we are not convinced of any abuse of discretion in limiting the time for argument.

We find no merit in the questions raised by the assignments of error. The judgment of the trial court is affirmed.

OTT, C. J., DONWORTH, WEAVER, and HAMILTON, JJ., concur.

April 3, 1964. Petition for rehearing denied.